

FILED

FEB 12 2018

COURT

**WARDS CORNER BEAUTY ACADEMY,**

    **Plaintiff,**

**v.**             **Civil No. 2:16cv639**

**NATIONAL ACCREDITING COMMISSION**
**OF CAREER ARTS & SCIENCES,**

    **Defendant.**

## OPINION AND ORDER

This Opinion and Order follows a two day evidentiary hearing/bench trial associated with Defendant's ("NACCAS") withdrawal of Plaintiff's ("Wards Corner") accreditation as a barbering and cosmetology academy. With the benefit of the trial transcript, the parties have submitted proposed findings of fact and conclusions of law. Therefore, the matter is ripe for review.

### I. Findings of Fact

In November of 2014, Wards Corner submitted its 2013 Annual Report to NACCAS, self-reporting that its graduation rate was below the required threshold of 50%. In early December, 2014, Defendant informed Plaintiff that it was being placed on "low outcomes monitoring" and that Plaintiff had twelve months to bring its graduation rate into compliance. In the fall of 2015, within the twelve-month window, Plaintiff submitted its 2014

annual report to NACCAS. Upon review of such submission, NACCAS determined that Plaintiff failed to demonstrate a compliant 2014 graduate rate. NACCAS nevertheless allowed Plaintiff one opportunity to submit supplemental information in an effort to demonstrate an accurate and compliant 2014 graduation rate, and after requesting and receiving an extension, Plaintiff submitted a supplement in January of 2016. In February of 2016, NACCAS held a week-long "Commissioner's Meeting," and at such meeting, Defendant determined that Plaintiff's accreditation should be withdrawn. The withdrawal decision was later affirmed through the NACCAS appeals process. While the instant lawsuit initially challenged several aspects of the withdrawal decision, the sole issue addressed at the evidentiary hearing was whether Plaintiff was denied its common law right to "fair procedure" in the accreditation review process as a result of the fact that Michael Bouman ("Mr. Bouman"), a NACCAS Commissioner that participated in such process, was an executive and part owner of a competitor cosmetology academy.

NACCAS' Commission is made up of thirteen Commissioners, including seven Commissioners that are owners or administrators of schools in fields of training within NACCAS' scope (which includes cosmetology and barbering), as well as two Commissioners representing each of the following areas: "Professional Services," "Academics," and "Public Interest."

2

During the relevant timeframe, Mr. Bouman was the "Chair of the Commission," and he was one of the seven Commissioners in the school owner/administrator category as he is employed by Empire Education Group, Inc. ("EEG"), a privately held corporation that operates cosmetology schools in twenty-one states.

NACCAS' written Code of Ethics states as follows:

1. INTEGRITY OF NACCAS - Each commissioner, officer and employee of NACCAS is expected to respect the integrity of NACCAS. Accordingly, no commissioner, officer or employee of NACCAS should be subject to influences, interests or relationships which conflict with the best interest of NACCAS and its objectives and purposes as set forth in its Articles of Incorporation and By-laws.

. . .

3. CONFLICT OF INTEREST - A conflict of interest exists when the duty of loyalty to NACCAS, including the furtherance of its objects and purposes as set forth in its Articles of Incorporation and By-laws, can be prejudiced by actual or potential personal benefit from another source. Each commissioner, officer, and employee is expected to avoid any investment, interest or association which interferes with the independent exercise of judgment in the best interest of NACCAS and those persons for whose benefit NACCAS was formed. Disclosures of personal interests or other circumstances which might constitute conflicts of interest are to be reported promptly by the commissioner, officer, or employee to the Chairman of NACCAS for resolution in the manner best suited to the interests of NACCAS and such individual.

. . .

6. ABUSE OF POSITION - No commissioner shall abuse his or her position to gain for himself, herself or others improper personal, material or pecuniary benefits.

. . .

3

Joint Ex. 3. In addition to the above quoted excerpts, unquoted portions of the Code of Ethics provide specifically enumerated conflicts which exist, in order to control against both a conflict of interest and "the perception of such conflicts." Id. These additional provisions expressly preclude a Commissioner from participating in voting or discussion involving any school owned or operated by the Commissioner, any school in the state in which the Commissioner lives, and any school in the same state as the corporate headquarters of the Commissioner's institution. Id.

Based on the NACCAS conflict of interest policy, Mr. Bouman was automatically disqualified from participating in voting or discussions involving any EEG school, as well as any schools in Montana or Pennsylvania. In addition to his automatic conflicts, Mr. Bouman would recuse himself on a case-by-case basis when he had some known interest or relationship with a school, such as when he had prior contact with a school regarding EEG's possible acquisition of such school.

Turning to the facts surrounding the competitive "conflict" alleged by Plaintiff in this case, in 2013, EEG opened a cosmetology school in Virginia Beach, Virginia, approximately twelve miles from the Norfolk, Virginia location of Wards Corner's cosmetology and barbering academy. When identifying

4

this location, and any other locations where EEG opens a new school, a key factor for EEG is accessibility to public transportation because 60-65% of EEG's students, companywide, rely on public transportation to commute to school. As described by Mr. Bouman, the average EEG student is between 19 and 24 years old, and the majority of students are single women with dependent children, a fact that can further complicate such students' ability to arrive to school on time through public transportation.

When EEG first opened its Virginia Beach School, Wards Corner was operating both its long-established Norfolk school and a second more recently established school in Virginia Beach. Wards Corner's Virginia Beach school was approximately three miles from the location where EEG opened its school.[1]   In December of 2014, Wards Corner closed its Virginia Beach location, with such closure due in part to the fact that Plaintiff's lease was expiring as the building where the school

---

[1] Wards Corner's Virginia Beach location opened in 2004 when Wards Corner purchased an unaccredited Virginia Beach beauty school.   In 2006, the Plaintiff's Virginia Beach school moved to a different location in Virginia Beach, where the school remained until its closure at the end of 2014.   Wards Corner made the decision to expand into Virginia Beach because the opportunity was available, and while the President of Wards Corner viewed the two locations as competing with each other "in a way," he viewed the opening of the second school as "just expanding into a larger market."   Tr. 26, 40-41.   Wards Corner's Chief Operating Officer ("COO") characterized the opening of the Virginia Beach location as an opportunity to "expand within the market," noting that it would be more convenient for students in that area, but she also testified that opening the Virginia Beach school had no impact on the number of enrollments at the Norfolk school.   Tr. 72-74.

was located was being torn down and turned into residential housing. When Wards Corner closed its Virginia Beach location, most of the students transferred to the Norfolk School, a few decided to go to EEG's Virginia Beach school, and some just dropped out.[2] A former Wards Corner manager believed that those students that did not transfer to the Norfolk location had transportation issues because they rode the bus and it is "a trek from Virginia Beach to Norfolk." Logan Depo. 13.

Although the parties strongly dispute the degree of competition between Wards Corner and EEG, the evidence presented at the evidentiary hearing unquestionably established that Plaintiff's Norfolk school and EEG's Virginia Beach school are "competitors" at some level. The Hampton Roads area, including the contiguous cities of Norfolk, Virginia Beach, Chesapeake, Portsmouth, Suffolk, Hampton, and Newport News, is a single media market. Television, radio and local online advertising all extend across city lines into what, in some ways, resembles a single metropolitan area. That said, the socioeconomic factors impacting students that attend both Wards Corner's and EEG's schools have a substantial impact on the area from which each school can attract students, with many of the students lacking access to private transportation. Such students

---

[2] Because Wards Corner knew that the Virginia Beach location was going to close at the end of 2014, it stopped enrolling students at that location and its enrollment decreased to only approximately twenty students at the time it closed. Logan Depo. 8-9.

naturally favor a school in close proximity to their homes due to the constraints involved in relying on public transportation, particularly for those students with young children. Moreover, because the cosmetology education process also involves developing a clientele during the period of instruction, to include friends and family, there are additional benefits associated with attending a school near an individual's residence.

During the timeframe most relevant to this case (2015 through February of 2016), there were five accredited cosmetology schools in the Hampton Roads area: Wards Corner (Norfolk), EEG (Virginia Beach), Regency Beauty Institute (Newport News), Rudy & Kelly Academy (located either in Chesapeake or Virginia Beach) and Suffolk Beauty Academy (Suffolk).[3] Plaintiff's Norfolk school was the only school operated by Wards Corner in 2015 and 2016, whereas EEG's Virginia Beach school was one of approximately ninety schools operated by EEG in numerous states.[4] Mr. Bouman estimated that EEG's Virginia Beach school accounted for slightly more than 1½ percent of EEG's total revenue, with such school expected to generate a profit of approximately $50,000 to $60,000 a year.

---

[3] Suffolk Beauty Academy is co-owned by the President of Wards Corner, with day-to-day operations of the Suffolk school handled by his ex-wife.

[4] The number of schools operated by EEG fluctuated over the relevant time period, but was always roughly one hundred schools located in over twenty states.

In early 2016 when Wards Corner's accreditation was being evaluated by the NACCAS Commission, Mr. Bouman was EEG's "President and COO" and earned an annual salary of approximately $260,000. Additionally, Mr. Bouman owned a small fraction (less than 1%) of EEG's stock that he had acquired through an employee stock program. Mr. Bouman acquired his stock through executing a promissory note, and in 2016, the stock that Mr. Bouman owned was worth less than the balance owed on the note.[5] Although Mr. Bouman testified that, as of February 2016, he was confused/ignorant as to whether he was actually a legal "owner" of EEG (because he never paid out-of-pocket for the stock and never personally possessed the stock certificates), any such misconceptions do not change the fact that Mr. Bouman was in fact a partial "owner" of EEG. He therefore had at least some personal financial interest in EEG performing well because his gain or loss on the company stock would presumably be determined (at some point in the future) based on EEG's performance/value.

In addition to his salary and small ownership interest, Mr. Bouman had in the past received bonuses from EEG. Specifically, he received an incentive bonus of over $137,000 in September of 2013 based on company-wide performance for fiscal year 2012. See Pl. Ex. 92. Also paid to Mr. Bouman in September of 2013

_____

[5] The original balance on the note was approximately $300,000, and while payments were not required, and were not made, interest did accrue on the note.

8

was a $10,000 bonus representing a 2012 "Christmas" bonus.  Id.
Due to an overall decline in the cosmetology industry, Mr.
Bouman did not receive any subsequent incentive/performance
bonuses, although he did receive two additional Christmas
bonuses of approximately $5,000, paid in December of 2013 and
December of 2014.  Id.  Mr. Bouman received no bonuses of any
kind in 2015, and as of February 2016, being very familiar with
EEG's performance and performance goals, Mr. Bouman was aware
that it was very unlikely that he would receive a bonus in that
year (and he ultimately did not receive a bonus in 2016).  Mr.
Bouman credibly testified that EEG, and many other companies in
the industry, had been less profitable for several years due
primarily to changes in government policy regarding the issuance
of student loans.[6]

Turning to February 2016, Mr. Bouman was present and
participated in the week-long NACCAS Commission Meeting where
Wards Corner's accreditation was withdrawn.  As Chairman of the
Commission, Mr. Bouman presided over the full Commission
meeting, which occurred late in the week, by calling the agenda
items and moderating the discussion.  He did not vote on any

---

[6] Such decline in the industry also resulted in EEG ending its salary
merit increases for its five senior managers (which included Mr. Bouman)
sometime around 2013.  Mr. Bouman explained that because the senior
managers were already so highly compensated, EEG made the decision to take
such managers out of the merit pool to allow for larger salary increases
for EEG's other 1,500 employees.  The year after such decision was made,
EEG elected to also take its sixteen vice presidents out of the merit
increase pool.

individual school actions at the meeting of the full Commission, but he was available to vote in the event there was a tie. After Mr. Bouman called the Wards Corner agenda item, another Commissioner presented the matter to the full Commission for discussion and voting, and at the conclusion of such discussion, the Commission unanimously voted (11-0) to withdraw Wards Corner's accreditation.

Although Mr. Bouman did not "vote" to withdraw Ward Corner's accreditation, in the days leading up to the meeting of the full Commission, he personally participated in reviewing Wards Corner's file. As explained in detail in open court, the NACCAS annual meeting lasts for several days, and a day or two before the full Commission meets to vote on school actions, one of four NACCAS "File Review Teams" meets to review several upcoming agenda items. Each of the NACCAS File Review Teams is an established group of the same three Commissioners, who work together to investigate potential action items and develop a recommendation to present to the full Commission later that week. Members of a File Review Team do not know which school actions they will work on until they meet on the designated day of the multi-day Commission meeting (the files are assigned by NACCAS staff).

As Chairman of the Commission, Mr. Bouman was not assigned to any of the four NACCAS file review teams. However, because

File Review Team Two was missing one of its three members at the February meeting, Mr. Bouman filled in as a substitute member of such team. Wards Corner's file was assigned to File Review Team Two.

Mr. Bouman does not have a clear recollection of any specific discussions that Team Two had about Wards Corner, but he acknowledges that he was present in the room for at least some part of the discussion. Additionally, Mr. Bouman signed the Wards Corner "Action Form," a two page document that includes limited information, but does expressly recommend withdrawal of accreditation. Such form was signed by Mr. Bouman as a "School Owner Commissioner," and was also signed by an "Academic Commissioner" a "Public Interest Commissioner," as well as two NACCAS "Staff Members." Joint Ex. 17. During his time acting as a substitute member of File Review Team Two, Mr. Bouman was unaware of Wards Corner's proximity to EEG's Virginia Beach School, and he had no prior dealings with Wards Corner.[7] Tr. 251-52, 262, 264. Being unaware of the existence of a "conflict," Mr. Bouman never even considered recusing himself from reviewing such file, and recommended withdrawal based on the merits of the file he examined.

_____

[7] Overall, the Court found Mr. Bouman's testimony to be very credible, to include his testimony that he joined File Review Team Two with good intentions. Mr. Bouman's testimony revealed that he performed all aspects of his role as a NACCAS Commissioner with honesty and integrity.

As noted above, after the full Commission voted to withdraw accreditation, Plaintiff unsuccessfully appealed such ruling through NACCAS' appeal procedures. Subsequent to the appeal, the instant lawsuit was filed. This Court previously granted partial summary judgment in favor of Defendant, but the disputed evidence and conflicting inferences associated with Mr. Bouman's interest in the outcome of Wards Corner's accreditation decision required an evidentiary hearing/bench trial.

## II. Conclusions of Law & Analysis

### A. Legal Standard for Judicial Review of an Accreditation Decision

The Fourth Circuit's opinion in Professional Massage Training Center, Inc. v. Accreditation Alliance of Career Schools & Colleges, 781 F.3d 161 (4th Cir. 2015) provides the standard governing the instant accreditation action. As explained in Prof'l Massage, "[a]ccreditation agencies are private entities, not state actors, and as such are not subject to the strictures of constitutional due process requirements." Id. at 169. However, because such agencies are "quasi-public" and "wield enormous power over institutions—life and death power, some might say," they owe a "common law duty . . . to employ fair procedures when making decisions affecting their members." Id. at 169-70 (citations omitted). Distilled to the simplest terms, the right to "fair procedure" requires

accreditation agencies "to play it straight." Id. at 170; see 2 William A. Kaplin & Barbara A. Lee, The Law of Higher Education § 15.3.2.2 (5th ed. 2013) (explaining that state or federal "common law" has been applied by various courts both to require an accreditation agency to "follow its own rules" and to follow "a variously described standard of fairness in their dealings with members," and that the "primary 'fairness' requirement seems to be that the agency must provide institutions with procedural due process before denying, withdrawing, or refusing to renew their accreditation").

In addition to establishing the legal duty owed by accreditation agencies, Prof'l Massage defines the scope of the Court's inquiry and the degree of deference that is owed to an accreditation decision. Importantly, "recognition that . . . a common law duty exists does not authorize courts to undertake a wide-ranging review of decisionmaking by accreditation agencies." Prof'l Massage, 781 F.3d at 170. Rather, the proper scope of the fairness review authorizes reviewing courts "to consider only whether the decision of an accrediting agency such as [NACCAS] is arbitrary and unreasonable or an abuse of discretion and whether the decision is based on substantial evidence." Id. at 171 (internal quotation marks and citation omitted). A district court is therefore prohibited from substituting its judgment for that of the accrediting agency and

may not "conduct a de novo review." Id. (citation omitted).

When performing the deferential review of an accreditation
decision to determine whether it "was supported by substantial
evidence," a district court should generally confine itself "to
the record that was considered by the accrediting agency at the
time of the final decision."[8]  Id. at 174-75.

In light of the Fourth Circuit's admonition that a district
court confine itself to the record considered by the accrediting
agency, the discovery tools typically available to a civil
litigant are either unavailable, or greatly circumscribed, in an
accreditation action. See id. at 172. The Fourth Circuit, has,
however, acknowledged that the scope of the Court's inquiry may
be expanded if a plaintiff makes "a strong showing of bad faith
or improper behavior."  Id. at 177-78 (quotation marks and
citation omitted).   Such rule exists because "an impartial
decisionmaker is an essential element of due process" regardless
of whether a district court is addressing a constitutional due
process claim or a claim grounded in the common law right to
fair procedure.   Id. at 177 (internal quotation marks and

---

[8] Applying such deferential standard, this Court previously granted
partial summary judgment in favor of Defendant, with the Court providing
an intentionally circumscribed analysis in light of the potential for
remand of this case to NACCAS due to the alleged conflict of interest.
ECF No. 140, at 8-11.   Although the Court's reasoning was concise, in
light of the substantial deference this Court owed to NACCAS's decision,
as well as the process/procedure Plaintiff was afforded prior to
accreditation being withdrawn (including repeated notices and multiple
opportunities to remedy its deficient graduation rate over a 15 month
period), Defendant's merits-based summary judgment motion was plainly
meritorious.

citations omitted). Therefore, in limited circumstances, a district court "may be justified in conducting a more searching inquiry into the motivations of administrative decisionmakers." Id. When performing such inquiry, "[a]n administrative decisionmaker is entitled to a presumption of honesty and integrity," although such presumption can be overcome through evidence demonstrating that an adjudicator has a "personal bias." Id. (internal quotation marks and citation omitted). A long-recognized form of disqualifying personal bias occurs when an "adjudicator has a pecuniary interest in the outcome." Id. at 178 (quotation marks and citation omitted). Here, the Magistrate Judge assigned to this case concluded that there was sufficient evidence to support targeted discovery, and after discovery, Plaintiff presented sufficient evidence to warrant an evidentiary hearing/bench trial, having identified disputed material facts that were not adjudicated during the accreditation review process and that bore on whether Plaintiff was denied its right to an "impartial decisionmaker."[9] Cf. Simmons v. Jarvis, No. 8:13cv98, 2016 WL 4742256, at *9 (D. Neb. Sept. 12, 2016) ("The burden of proof required for supplementing

---

[9] The pre-hearing disputed facts, and inferences to be drawn therefrom, included the degree of competition between Wards Corner and EEG, the degree to which Mr. Bouman had a financial interest in EEG's success, and the degree to which Mr. Bouman participated in the accreditation review process in February of 2016. Notably, it appears that Mr. Bouman's participation as a member of the File Review Team was not known or knowable to Wards Corner at the time that accreditation was withdrawn (explaining why his participation was not challenged at the time).

15

the administrative record is lower than that required for demonstrating bad faith or bias on the merits." (quoting Pitney Bowes Government Solutions, Inc. v. United States, 93 Fed. Cl. 327, 332 (2010))).

## B. A Disqualifying Pecuniary Interest must be "Direct" and "Substantial"

While Prof'l Massage expressly recognizes both that the procedural right to an impartial decisionmaker extends to accreditation actions and that an adjudicator with a pecuniary interest in the outcome violates such procedural right, Prof'l Massage does not clarify the contours of a disqualifying pecuniary interest because the case did not involve facts capable of supporting such a claim. Prof'l Massage, 781 F.3d at 178. Turning to other relevant case law on the subject, as explained by the United States Supreme Court long before Prof'l Massage was decided:

It is sufficiently clear from our cases that those with substantial pecuniary interest in legal proceedings should not adjudicate these disputes. Tumey v. Ohio, 273 U.S. 510, (1927). And Ward v. Village of Monroeville, 409 U.S. 57 (1972), indicates that the financial stake need not be as direct or positive as it appeared to be in Tumey. It has also come to be the prevailing view that "(m)ost of the law concerning disqualification because of interest applies with equal force to . . . administrative adjudicators." K. Davis, Administrative Law Text § 12.04, p. 250 (1972), and cases cited.

Gibson v. Berryhill, 411 U.S. 564, 579 (1973) (emphasis added) (alteration and omission in original). In Gibson, the Supreme

16

Court affirmed the district court's determination that the Alabama "State Board of Optometry was so biased by . . . pecuniary interest that it could not constitutionally conduct hearings" addressing the potential revocation of licenses for a large block of corporate optometrists. Id. at 578. The district court's analysis of constitutional due process in Gibson did not turn on "whether the [Optometry] Board members were actually biased," but rather, considered "whether, in the natural course of events, there is an indication of a possible temptation to an average man sitting as a judge to try the case with bias for or against any issue presented to him." Id. at 571 (quotation marks and citation omitted). Such objective temptation standard was met in Gibson because the Board was evaluating whether to revoke the licenses of "all optometrists in the State who were employed by business corporations," a category of individuals that accounted for nearly half of all practicing optometrists in Alabama. Id. at 578. If such large-scale revocations occurred, "the individual members of the Board, along with other private practitioners of optometry, would fall heir to this business." Id. at 571 (emphasis added). On those facts, the Supreme Court found "no good reason" to overturn the district court's conclusion that the Board members had a disqualifying pecuniary interest due to the degree of likelihood that a successful revocation effort by the Board

"would possibly redound to the personal benefit of members of the Board." Id. at 578-79.

Subsequent to Gibson, in another case involving a constitutional due process analysis, as contrasted with the common law "fair procedure" analysis involved here, the Supreme Court clarified that a litigant is not denied an impartial decisionmaker when a judge or justice has "a slight pecuniary interest" in the outcome, as contrasted with an interest that is "direct, personal, substantial, [and] pecuniary." Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 825-26 (1986) (alteration in original) (internal quotation marks and citations omitted). The Supreme Court went on to clarify that an interest that is "highly speculative and contingent" is not disqualifying, and that "at some point, '[t]he biasing influence . . . [will be] too remote and insubstantial to violate the constitutional constraints.'"[10]    Id. at 826 (alteration and omission in original) (quoting Marshall v. Jerrico, Inc., 446 U.S. 238, 243 (1980)). More recently, in Caperton v. A.T. Massey Coal Co., 556 U.S. 868 (2009), the Supreme Court summarized the facts and

---

[10] As quoted above, Gibson recognizes that case law governing conflicts in judicial adjudications is generally applied, but not necessarily controlling, to decisions made by administrative adjudicators. Gibson, 411 U.S. at 579. Arguably, an accreditation decision made by a private accreditation body such as NACCAS (owing a right to fair procedure), rather than a state licensing board (owing a right to constitutional due process), is one step further removed from the standard applicable to a judicial adjudication. That said, as established in Prof'l Massage, the common law fair procedure right applicable to a private accreditation body such as NACCAS still requires an unbiased adjudicator.

18

holdings of its earlier decisions in Tumey, Ward, and Lavoie, id. at 877-79, explaining that the Lavoie opinion stressed that the constitutional due process standard applicable to judges, and mayors sitting as judges, did not turn on whether the judge was actually influenced by the alleged pecuniary motivation, id. at 878. Rather, the standard turns on whether the judge's position/interest "would offer a possible temptation to the average . . . judge to . . . lead him [or her] not to hold the balance nice, clear and true." Id. at 879 (omissions in original) (quoting Lavoie, 475 U.S. at 825). The Caperton opinion further noted that although the "'degree or kind of interest . . . sufficient to disqualify a judge from sitting cannot be defined with precision,'" in the Supreme Court's view, it is "important that the test have an objective component." Id. (quoting Lavoie, 475 U.S. at 822); cf. Del Vecchio v. Illinois Dep't of Corr., 31 F.3d 1363, 1375 (7th Cir. 1994) (explaining, in the context of an allegedly biased judge presiding over a criminal case, that "[t]he question is not whether some possible temptation to be biased exists; instead, the question is, when does a biasing influence require disqualification," further holding that "[d]isqualification is required only when the biasing influence is strong enough to overcome [the presumption of honesty and integrity], that is,

when the influence is so strong that we may presume actual bias").

Consistent with such Supreme Court precedent acknowledging the difference between a "direct" and "substantial" pecuniary interest and a "remote" or "slight" pecuniary interest, the Fourth Circuit has held that, even under the stringent ethical rules applicable to federal judges, recusal is unnecessary/improper if the financial interest at issue is remote and contingent. In re Virginia Elec. & Power Co., 539 F.2d 357, 368 (4th Cir. 1976). In that case, there was a "remote contingent possibility that [the judge] may in futuro share in any refund that might be ordered" to all customers of the plaintiff electric company if the plaintiff's success in such litigation led to a customer refund to adjust for incorrectly calculated fuel costs. Id. at 366. As a customer of the electric company, the judge's potential financial interest was between $70 and $100, although such sum could have been refunded over a period as long as forty years. Id. at 360. Although the district judge concluded that "existing legal authorities did not require recusal," he determined that a recent amendment to 28 U.S.C. § 455, a statue governing judicial disqualification, did require recusal.[11] Id. at 363. Consistent

---

[11] As explained by the Fourth Circuit, the district judge incorrectly relied on the then-recent amendments to § 455 as they were not applicable to that case due to their date of passage; however, the error in "applying

20

with applicable federal canons of judicial ethics, the amended statute provided that a federal district judge is required to recuse himself if "[h]e knows that he . . . has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding," with the statue further defining financial interest as "ownership of a legal or equitable interest, however small." Id. at 362 (emphasis omitted) (quoting 28 U.S.C. § 455). Even under such broad definition of "financial interest," the district judge noted the absence of a disqualifying financial interest, concluding that he did not have a "direct and personal pecuniary interest in the case." Id. However, the district judge nevertheless determined that recusal was necessary because he had "any other interest that could be substantially affected by the outcome of the proceeding." Id.

In reviewing the district court's analysis, the Fourth Circuit agreed that the district judge did not have a financial interest in the outcome because the district judge held, at most, a "contingent interest" that was dependent upon not only a judgment in favor of the plaintiff electric company, but a

---

as the law of the case a statute not yet in effect . . . is of no great consequence with respect to the result . . . because the new statute closely tracks [Judicial] Canon 3C, and clearly the district judge appropriately examined Canon 3C as a guideline in the exercise of his sound discretion." In re Virginia. & Power Co., 539 F.2d at 366.

subsequent "independent decision of a state agency, the Virginia State Corporation Commission," which would be required to determine "whether to order a refund, in what amount, and over what period of time." Id. at 366. The Fourth Circuit likened the judge's financial interest to what is known as a "bare expectancy" in property law. Id. at 366-67.

Having found no disqualifying "financial interest," the Fourth Circuit considered whether the district judge held "any other interest that could be substantially affected by the outcome of the proceeding," noting that it was "not easy to conclude" what such alternative term means. Id. at 367. In attempting to define such "imprecise" standard, the Fourth Circuit noted that a leading treatise on federal practice suggested consideration of "the interaction of two variables: the remoteness of the interest and its extent or degree." Id. at 368 (quotation marks citations omitted). The Fourth Circuit then explained as follows:

It is quite significant, we think, that the words "however small" apply only to a "financial interest." Their meaning is perfectly clear. If a judge has an ownership interest in a party or in the subject matter in controversy, it matters not at all whether the interest is a large or infinitesimally small amount. But that is not so with respect to "any other interest." The difference is a sensible one. A monetary or financial interest is by its very nature such an interest that may generate doubt as to a judge's impartiality. What is a small sum to one person may not be to another. But a "bare expectancy" or chance to ultimately benefit on an equal basis with

all other customers is not so suspect in nature. And that is why, we think, Congress did not see fit to add the words "however small" to modify "any other interest." Thus a judge who is a customer of a company must necessarily consider the remoteness of the interest and its extent or degree. We have already demonstrated that [the] interest here is remote and speculative and that whether [the judge] ever gets any refund benefit will not be determined by him nor by the result of this litigation.

Id. at 368.

### C. Competitive Pecuniary Interest in Accreditation/Licensing Cases

With that backdrop, consisting primarily of cases involving constitutional due process rights in the context of judicial decisionmaking, the Court turns its attention to placing a finer point on what constitutes an "impartial decisionmaker" under the common law right to "fair procedure" in the context of accreditation or licensing administrative decisionmaking. More specifically, the Court must determine what degree of competitive interest in the outcome of an accreditation or licensing decision must exist to constitute a "direct" and "substantial" pecuniary interest. In light of limited case law on such issue, the requisite analysis necessitates continued reliance, at least in part, on cases involving the right to constitutional due process.

In Stivers v. Pierce, 71 F.3d 732 (9th Cir. 1995), a case involving the constitutional right to due process from a state licensing board, the plaintiffs asserted that "one of the Board

members had a pecuniary interest in the outcome and was biased against them," and that such bias influenced other board members and employees, causing them to deny plaintiffs' application for a license in the field of private investigation. Id. at 736. Finding that the plaintiffs had the constitutional right to "a fair trial in a fair tribunal," the Court explained that a plaintiff may demonstrate a violation of such right either by demonstrating: (1) "actual bias on the part of the adjudicator"; or (2) that "the adjudicator's pecuniary or personal interest in the outcome of the proceedings" was significant enough to create an "appearance of partiality that violates due process, even without any showing of actual bias." Id. at 741 (citing Gibson, 411 U.S. at 578). Analyzing the subset of facts relevant to the claim grounded in an asserted "appearance of partiality," the Ninth Circuit explained as follows:

> Stivers has introduced evidence showing that Pierce had a pecuniary interest in ensuring that Stivers' license applications were denied. A short time before the licensing proceedings began, Stivers had entered into direct competition with Dick Pierce and Associates. Stivers asserts that Pierce's pecuniary interest in stifling competition rendered his participation in the licensing proceedings constitutionally objectionable.
>
> Among the cases in which the appearance of bias is "too high to be constitutionally tolerable" are those in which the adjudicator has a direct and substantial pecuniary interest in the outcome of the case before him. Withrow v. Larkin, 421 U.S. 35, 47 (1975). In such cases, the adjudicator's participation constitutes a per se violation of due process—the

appearance of partiality in itself renders the proceedings objectionable, without any showing that the adjudicator was actually biased. [Lavoie], 475 U.S. at 825; Utica Packing Co. v. Block, 781 F.2d 71, 77-78 (6th Cir. 1986).

The Supreme Court has held that a state licensing tribunal violates due process when its members have a direct and substantial competitive interest in the outcome of the proceedings before them. Gibson, 411 U.S. at 578-79. . . . Without requiring any showing that the board's decision was actually influenced by impermissible bias, the Court upheld the district court's conclusion that the board members' "substantial pecuniary interest" in denying licenses to competitors constituted a per se violation of the plaintiffs' right to due process. Id. at 579.

The Court's decision in Gibson did not invalidate all licensing boards that include industry representatives. After Gibson, the Court upheld a state statute requiring that a majority of optometry board members be drawn from an organization of professional optometrists. Friedman v. Rogers, 440 U.S. 1, 18 (1979). More recently, the Court has made clear that due process is not violated by the participation of adjudicators who "might conceivably have had a slight pecuniary interest" in the outcome of the case before them. [Lavoie], 475 U.S. at 825. An adjudicator is, however, precluded from participating in decisions in which he has a "direct, personal, substantial, pecuniary interest." 475 U.S. at 822.

The fact that Pierce and Stivers have in the past competed for a few specific contracts is not in itself sufficient to meet this standard. While under Stivers' management, [his company] outbid Pierce's company for the convention business at Bally's and other business totaling $55,000, the contracts constituted a relatively small portion of Dick Pierce and Associates' $5 million annual receipts. Nevertheless, there may be a genuine issue as to whether Pierce had a sufficient interest in the denial of Stivers' application to necessitate his recusal. Unlike most other license applicants before the Board, who sought to do business in the more populous

25

Southern Nevada region, Stivers intended to enter into business in the Reno area, where he would operate in direct competition with Pierce. See Wilkerson v. Johnson, 699 F.2d 325, 328 (6th Cir. 1983) (licensing board member's interest in preventing barber shop from opening next door to his own created "unconstitutional risk of bias"). There are other pertinent facts that do not appear in the record as developed thus far. We do not know, for example, how many similar businesses are currently licensed in the Reno area, what effect one more business is likely to have, or even much about the nature of the market or the particular qualifications or attributes that Stivers and Pierce may possess. Such facts may be critical in determining whether Pierce had a "direct" and "substantial" pecuniary interest that would constitute a per se due process violation.

There are undoubtedly cases in which the appearance of partiality arising from competitive interests is sufficiently strong to warrant recusal. See Gibson, 411 U.S. at 578-79. A lawyer in a one-lawyer town, for example, would probably have a "direct" and "substantial" pecuniary interest in the licensing of a competitor planning to hang a shingle across the street. On the other hand, it is unlikely that any attorney practicing in a city like Los Angeles would have a competitive interest sufficiently strong to require that he be disqualified from considering the licensing of an additional lawyer.

We note that any per se rule governing the appearance of partiality must take into account the fact that the system of industry representation on governing or licensing bodies is an accepted practice throughout the nation. As the Supreme Court has pointed out, the Due Process Clause imposes "only broad limits . . . on the exercise by the State of its authority to regulate its economic life, and particularly the conduct of its professions." Friedman, 440 U.S. at 18 n.19. If members of a licensing board were disqualified whenever they have "some" competitive interest in the outcome of proceedings before them, practitioners in the field would as a practical matter be excluded from becoming members of such boards.

26

There are, of course, advantages to the involvement of industry representatives in licensing decisions. Private investigators, for example, can bring a particular practical understanding and perspective to the proceedings. It is presumably for this reason that the Board, by statute, must include a private investigator, a private patrolman, and a polygraphic examiner. See Nev. Rev. Statute § 648.020(1). Were we to hold Pierce's participation impermissible, based solely on the fact that there may on occasion be "some" competition for clients, we would call into question the composition not only of the Board involved in the case before us but many other boards throughout the circuit that include industry representatives among their membership. That we do not wish to do.

Without more facts, it does not appear that Pierce's economic interest is such as to warrant a per se disqualification. Upon remand, however, Stivers is free to introduce evidence tending to show that Pierce's pecuniary interest is in fact sufficient to warrant application of the per se rule.

Stivers, 71 F.3d at 742-44 (emphasis added).[12]

Subsequent to Stivers, the First Circuit addressed an allegation that members of a dairy commission sitting in a quasi-judicial capacity were biased based on their financial

---

[12] In Stivers, the Ninth Circuit went on to evaluate whether the alleged competition, past business association, prior negative statements by the defendant, etc. were sufficient to demonstrate "actual bias." Stivers, 71 F.3d at 744-46. Here, as suggested by this Court's summary judgment opinion, ECF No. 140, at 18-19, and as further bolstered by Mr. Bouman's credible testimony in open court, there is no evidence on which a reasonable juror could conclude that "actual bias" had any impact on the outcome of the accreditation review process. Cf. Marlboro Corp. v. Ass'n of Indep. Colleges & Sch., Inc., 556 F.2d 78, 82 (1st Cir. 1977) (describing the "risk of actual prejudice [as] quite remote" in light of the fact that the plaintiff had no evidence that "the decision was in fact tainted by bias," but instead "points only to the presence of one individual at the final step in a prolonged process of evaluation and review as evidence of bias"). Accordingly, utilizing the nomenclature set forth in Stivers, the question before this Court is limited to whether Mr. Bouman's position at EEG created an impermissible risk of bias that warrants "per se disqualification."

interest in the outcome of an administrative proceeding. New York State Dairy Foods, Inc. v. Ne. Dairy Compact Comm'n, 198 F.3d 1, 14 (1st Cir. 1999). Applying the constitutional due process standard articulated in Lavoie that requires more than a possibility of a slight pecuniary interest, and considering the case-specific facts, the First Circuit determined that "any potential financial interest on the part of individual panel members is highly attenuated," noting that "a panel member would have to be swayed by his own pro rata share in the additional profits (assuming that there are any) of a relatively tiny proportion of the Compact milk" at issue. Id. Relying in part on the similarities to the lawyer example contained in the Stivers opinion, the First Circuit "agree[d] with the Ninth Circuit that at some level of attenuation, as here, the adjudicator's interest becomes too remote to have a constitutionally deficient effect." Id. at 14-15; see Marler v. Missouri State Bd. of Optometry, 102 F.3d 1453, 1457 (8th Cir. 1996) (rejecting the plaintiff's assertion of bias based on his contention that he was in "direct economic competition" with one of the Board members who participated in revoking his license to practice optometry because the case-specific facts demonstrated that the plaintiff "was an optometrist at the Wal-Mart Vision Center" and that "the Wal-Mart Vision Center would continue to employ an optometrist and remain in competition with the Board

member, regardless of the status of [the plaintiff's] license,"
resulting in the Board member having "at most a slight pecuniary
interest in the outcome of the proceedings"); see also Williams
v. Gov't of Virgin Islands Bd. of Med. Examiners, 360 F. App'x
297, 300 (3d Cir. 2010) (rejecting the plaintiff's claim that
"he was in direct competition" with a doctor that sat on the
Board that conducted disciplinary proceedings against the
plaintiff, noting that the plaintiff "presented little, if any,
persuasive evidence" that he competed with such doctor or that
such doctor had "even a slight pecuniary interest in the outcome
of the Board's proceedings against [the plaintiff]").

In a conceptually similar case to the instant matter
involving a state licensing board, the Sixth Circuit affirmed a
jury verdict for the plaintiffs based on a state agency's
improper actions surrounding the plaintiffs' efforts to operate
a licensed barber shop. Wilkerson v. Johnson, 699 F.2d 325, 328
(6th Cir. 1983). In that case, one of the members of the
"Tennessee Board of Barber Examiners, a state licensing agency,"
operated a barber shop next door to the location of the
plaintiff's proposed business. Id. at 326. The Sixth Circuit
characterized the trial evidence as establishing that "the
licensing of the new barber shop next door would have created
direct and significant competition for" the interested Board
member, noting that he "clearly had the kind of interest in the

licensing decision which creates an unconstitutional risk of bias." Id. at 328; cf. Klein v. Sobol, 167 A.D.2d 625, 629-30, 562 N.Y.S.2d 856, 860-61 (1990) (rejecting the petitioners' assertion that they were denied an impartial decisionmaker in a case involving a hearing before a "Panel of the State Board of Podiatry," noting that notwithstanding the fact that "three of the practicing podiatrists on the Panel were located within approximately 14 blocks, four miles and 10 miles from petitioners' respective offices," the petitioners "simply did not offer sufficient evidence to establish that" the identified Panel members had a disqualifying "pecuniary interest" in the outcome of the hearing).

In light of the authorities cited herein, determining what degree of competition renders an industry practitioner sufficiently "interested" in the outcome of an accreditation decision to require recusal under the common law right to "fair procedure" must necessarily turn on the case-specific facts. Mindful of the Fourth Circuit's analysis in Prof'l Massage, this Court does not suggest that the legal test for "impartiality" is subject to materially different formulations in different situations, but rather, holds that context is critical. Two examples offer helpful illustration of this point. First, although it is well-established that a judge or other adjudicator should not preside over a matter where he or she has

a close personal relationship with one of the parties, the contours of what constitutes a "close" personal relationship are certainly different in a city with five million residents than they are in a rural town with five hundred residents. See In re Murchison, 349 U.S. 133, 136 (1955) (explaining that while "no man is permitted to try cases where he has an interest in the outcome," a disqualifying interest "cannot be defined with precision," requiring "circumstances and relationships" to be considered); Marlboro Corp. v. Ass'n of Indep. Colleges & Sch., Inc., 556 F.2d 78, 82 (1st Cir. 1977) (noting that while a "[d]ecision by an impartial tribunal is an element of due process under any standard," the "particular facts and 'local realities' of any given case must determine whether there is an actual or apparent impropriety that amounts to a denial of due process"). Second, as explained by the Ninth Circuit, a lawyer in a "one-lawyer town" who is called upon to consider the licensing of a second attorney in such town faces vastly different "competitive" motivation than an attorney considering the "licensing of an additional lawyer" in a large city like Los Angeles. Stivers, 71 F.3d at 743.

The need to focus on case-specific "circumstances and relationships" and "local realities" is arguably further elevated where: (1) as in Stivers, the Board/Committee at issue was intentionally designed to require participation of industry

31

practitioners who, unlike an Article III judge, actively participate/practice in the very industry that they are called on to evaluate; and (2) the alleged interest at issue is not a "direct" monetary interest in the outcome of the case (such as a judge imposing a fine that will fund his salary, or a member of a licensing commission voting against the suspension of a license for a business that he or she partially owns), but rather, is an indirect competitive interest involving the elimination of a purported "competitor" within a given field, an interest that may, or may not, translate into a financial gain for the allegedly interested adjudicator. Although the pragmatic desire to have industry practitioners on an administrative board or commission cannot excuse the participation of a truly "interested" adjudicator, practical realities appear to allow, consistent with the common law right to fair procedure, that some degree of "independence" be forfeited in certain administrative contexts. See Stivers, 71 F.3d at 743 (noting that if a disqualifying conflict were found "based solely on the fact that there may on occasion be 'some' competition for clients" between the practitioner-decisionmaker's company and the company with a matter pending before the licensing board, "[it] would call into question the composition" of numerous boards across various industries); 2 Charles H. Koch, Jr. & Richard Murphy, Administrative Law &

Practice § 6:10 (3d ed.) (explaining that, although a disqualifying conflict may be based on "'an unacceptable probability of actual bias on the part of those who have actual decisionmaking power,' . . . [a]bsolute impartiality is not required" in the administrative context, even when the right at issue is constitutional due process) (citations omitted).

In sum, this Court finds that the degree to which prudence and caution support a finding of a disqualifying conflict in the face of an indirect pecuniary interest cannot be evenly applied across all possible adjudications. See Pinar v. Dole, 747 F.2d 899, 907 (4th Cir. 1984) ("'[I]t has been said so often . . . as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands.' Indeed, '[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.'" (second alteration in original) (quoting Cafeteria Workers v. McElroy, 367 U.S. 886, 895 (1961))). The attendant differences are clear when drawing a comparison between a federal judge presiding over a criminal bench trial, and an administrative panel determining whether to revoke a professional accreditation. The judge in such hypothetical is presumed to be starting from a completely neutral position, and in the rare instances where a conflict or pecuniary interest is identified that even arguably calls the

33

judge's impartiality into question, prudence often dictates that the judge be recused and the case reassigned to another judge. In contrast, a commission made up of multiple industry practitioners determining whether to withdraw the accreditation or license of a fellow practitioner is presumed to often find itself starting from a position where some slight conflict/pecuniary interest exists, because whenever accreditation or a license to operate is withdrawn within a given field, some potential benefit will necessarily inure to a practitioner-decisionmaker based on the fact that an additional person/entity has been removed from the pool of competitors.[13] See 2 Koch & Murphy, supra § 6:10 (explaining in a subsection titled "Nonconstitutional limits on bias in adjudication" that "Administrative officials are presumed to be objective and capable of judging particular controversies fairly and on the basis of their own circumstances," and that "[a]dministrative adjudicators may not have the independence of an Article III judge but they may be held to the same standard of impartial decisionmaking"). Stated differently, whether an alleged pecuniary conflict grounded in the competitive impact of a court

[13] As noted above, here, the NACCAS Board of Commissioners included seven industry practitioners that were school owners or administrators. Each of these individuals had at least some potential competitive interest in closing Plaintiff's school because even if none of the practitioners directly competed with Wards Corner as of February of 2016, the closure of such school manufactures the opportunity for a new school to enter the Norfolk market and fill the void left by the closure of Plaintiff's cosmetology and barbering academy.

34

case or administrative adjudication is "direct" and "substantial" or whether it is "indirect" or "slight" appears to depend on the nature of the adjudication, the industry in question, the degree of competition in the case, and the role the allegedly biased adjudicator played. As characterized by the Supreme Court of Connecticut:

> The applicable due process standards for disqualification of administrative adjudicators do not rise to the heights of those prescribed for judicial disqualification. . . . The mere appearance of bias that might disqualify a judge will not disqualify an arbitrator. . . . Moreover, there is a presumption that administrative board members acting in an adjudicative capacity are not biased. . . . To overcome the presumption, the plaintiff . . . must demonstrate actual bias, rather than mere potential bias, of the board members challenged, unless the circumstances indicate a probability of such bias too high to be constitutionally tolerable. . . . The plaintiff has the burden of establishing a disqualifying interest.

Moraski v. Connecticut Bd. of Examiners of Embalmers & Funeral Directors, 291 Conn. 242, 262, 967 A.2d 1199, 1213 (2009) (omissions in original) (quotation marks and citations omitted). Such standard was subsequently applied by a federal district court as part of its due process analysis in Fromer v. Town of Windsor, No. 3:10cv1780, 2011 WL 10604771 (D. Conn. Apr. 15, 2011), aff'd, 472 F. App'x 40 (2d Cir. 2012), with the district court noting both the presumption of honesty and integrity and the Connecticut Supreme Court's holding that due process standards for administrative adjudications are something less

than that applicable to judges. Id. at *11 (citing Petrowski v. Norwich Free Acad., 199 Conn. 231, 238, 506 A.2d 139, 142-43 (1986)).

**D. Competitive Pecuniary Interest in this Case**

Returning to the facts of the instant case, the Court addresses the following three areas relevant to Mr. Bouman's alleged interest in the outcome of Plaintiff's accreditation review: (a) the degree of competition between EEG and Ward's Corner; (b) the scope of Mr. Bouman's financial interest in EEG; and (c) Mr. Bouman's role in the accreditation withdrawal decision. As outlined in Prof'l Massage, administrative decisionmakers are "entitled to a presumption of honesty and integrity," Prof'l Massage, 781 F.3d at 177-78, and "the burden of establishing a disqualifying interest rests on the party making the assertion," Schweiker v. McClure, 456 U.S. 188, 196 (1982). Here, in the absence of evidence of actual bias, Plaintiff has the burden to demonstrate that Mr. Bouman had a "potential for bias [that] is impermissibly high," requiring his recusal from the accreditation review process. Prof'l Massage, 781 F.3d at 178. After conducting an evidentiary hearing to examine disputed evidence and inferences in these three areas in a case that presents a relatively close call, the Court finds that Plaintiff has failed to carry its burden of showing that Mr. Bouman's limited pecuniary interest overcomes the

presumption of honesty and integrity and/or otherwise demonstrates such a substantial risk of bias that Plaintiff was denied its common law right to "fair procedure" based on Mr. Bouman's participation in the accreditation review process.[14]

## 1. Competition

The trial evidence demonstrates that, during the relevant timeframe, there was some degree of competition between Plaintiff's Norfolk School and EEG's Virginia Beach School.[15] Prior to the evidentiary hearing/bench trial, the limited distance between these Norfolk and Virginia Beach schools (approximately twelve miles) itself raised the specter of substantial competition; however, the trial evidence demonstrated that while competition unquestionably existed, the nature of the industry and the resources of the typical student educated by both Plaintiff and EEG created substantial limitations on the degree of direct competition. Notably,

---

[14] In reaching such conclusion, the Court has considered, and rejects, Plaintiff's contention that a conflict of interest existed because Mr. Bouman owed a fiduciary duty to EEG. While Mr. Bouman plainly had an obligation to act in EEG's best interests when acting on its behalf, Plaintiff's suggestion that Mr. Bouman had a duty to EEG to drive all "competitors" out of business through the power he wielded as Chairman of NACCAS is not compelling. Such a rule would in essence preclude any practitioner from being a Commissioner, and ignores: (1) the reality that EEG's interests were likely furthered by having its President on the Commission; and (2) as an operator of nearly 100 schools, it was in EEG's interest that the Commission fairly evaluate all accreditation matters as the makeup of the Commission would change over time.

[15] The competition was obviously greater during the period that Plaintiff operated its Virginia Beach school; however, the closure of such school occurred long before Mr. Bouman participated in the challenged accreditation review.

37

Defendant presented credible evidence that the majority of EEG's students do not have access to a private vehicle and therefore rely on public transportation to commute to school. Such reality limited EEG's ability to draw students from outside the immediate area surrounding its Virginia Beach school. Mr. Bouman's testimony on relevant socioeconomic factors and EEG's approach of targeting a student body in close proximity to its schools was not only credible, but it was supported by additional evidence, including Mr. Bouman's unrefuted testimony that EEG operates two schools approximately 20 to 25 miles apart near Richmond, Virginia (demonstrating the limited reach of each school). Moreover, Plaintiff's own evidence confirmed Mr. Bouman's statements about the nature of the industry, including: (1) the pretrial sworn statement by Plaintiff in its verified complaint indicating that the "competitor" schools in the region, which included EEG's school, were all "a considerable commuting distance away" and that "few of [Plaintiff's] students own or have access to private transportation," Am. Compl. ¶ 45, ECF No. 28; (2) the live testimony of Plaintiff's President confirming that, in the "market that we deal with," it is "hard to afford transportation," and the difficultly securing transportation was "reason alone" for many students to drop out when Wards Corner lost its accreditation, Tr. 37-38, 44; (3) Plaintiff's acknowledgement that only three of fifty-eight

students asked for documentation necessary to transfer their credits to EEG when Wards Corner lost its accreditation, id. at 44; and (4) the fact that Plaintiff had operated a Virginia Beach location for several years within approximately ten miles of its Norfolk location and its President presently co-owns a school in Suffolk operated by his ex-wife (both providing additional evidence of the limited geographic reach of each school), id. at 19.

In considering the case-specific facts relevant to the degree of competition, this Court also considers the fact that Wards Corner's Norfolk school was a cosmetology and barbering academy, whereas EEG's Virginia Beach school was limited to teaching cosmetology, further reducing the degree of competition between Plaintiff and EEG.[16]  Moreover, while the undisputed

---

[16] Plaintiff's President testified that the annual report submitted by Wards Corner to NACCAS in 2015 reflects that twenty percent of Plaintiff's students lived in Virginia Beach.  Tr. 26.  However, such report covered the prior academic year when Wards Corner still had its Virginia Beach location open.  Additionally, a review of the documentation from such year reveals that some of the students who lived in Virginia Beach were enrolled in Plaintiff's barbering program.  Joint Ex. 46.  Wards Corner's COO testified at the evidentiary hearing and provided a "student by student" review of numerous enrollees during 2014, but she identified only two students who lived in Virginia Beach and attended Wards Corner's Norfolk cosmetology program.  Tr. 58-60.  The fact that multiple Norfolk cosmetology students lived in Portsmouth, Virginia is of limited evidentiary value in light of the fact that Portsmouth did not have an accredited cosmetology academy and it is located immediately across the river from Norfolk and there are two tunnels connecting the cities. Shifting focus to the number of Virginia Beach students attending Plaintiff's Norfolk school after the Virginia Beach location closed, Plaintiff's post-hearing briefing asserts that 12% (7/58) of the students who left Wards Corner after its accreditation was lost in 2016 lived in Virginia Beach.  ECF No. 150, at 6.  Such figure, however, suffers from two infirmities.  First, it is calculated based on such individuals'

39

evidence demonstrates that both schools operate in the same broader media market, there is no evidence before the Court establishing that EEG took active steps to recruit students from the city of Norfolk and/or students that were otherwise considering enrolling at Plaintiff's school.

In addition to the real, but limited, competition between the schools for a small percentage of cosmetology students, the fact that there are several other competitors in the broader Hampton Roads area, to include a "competitor" academy co-owned by the President of Wards Corner, is relevant to the competition calculus. Also relevant is the size and scope of EEG's companywide operations. Mr. Bouman's testimony established that the Virginia Beach location was one of approximately ninety schools owned and operated by EEG, and that it accounted for slightly more than 1½ percent of EEG's revenue, with anticipated annual profits of around $50,000 to $60,000. While such facts do not undercut the reality that EEG and Wards Corner competed on a local basis for some fraction of potential cosmetology

addresses as listed on Plaintiff's proposed witness list in the final pretrial order entered in this case, and therefore appears to reflect current addresses as of November 2017 rather than addresses at the time of enrollment. Second, and more importantly, such figure does not indicate how many of these seven students were enrolled in the cosmetology program, as contrasted with the barbering program. As noted above, it is unremarkable to the competition calculus if Virginia Beach barbering students attended Plaintiff's Norfolk school because EEG does not offer a barbering course in Virginia Beach. In summary, as repeatedly stated herein, while the record plainly demonstrates that "some" competition for cosmetology students existed in early 2016 when Mr. Bouman participated in the accreditation review process, the evidence suggests that the schools directly competed for a small fraction of their cosmetology student body.

students that would be willing, and able, to commute to either location, EEG did not compete with Wards Corner for the vast majority of its overall student body, who were educated in areas outside of Hampton Roads, Virginia. Stated differently, the size of EEG's overall company is certainly not dispositive because EEG has a legitimate business motivation to succeed in every market in which it participates; however, EEG's overall size lends useful context because the respective motivations of both schools, and the degree of familiarity (or lack thereof) that EEG had with Wards Corner would be far different if, for example, EEG was truly a "local" competitor whose entire operation consisted of two or three schools in Southeast Virginia.

Considering the likelihood, and scope, of any potential immediate benefit that EEG would realize from the closure of Plaintiff's school, first, EEG's Virginia Beach school was only one of four local "competitors" to Wards Corner, and would likely have to "compete" to a degree for any resulting benefit. Second, the scope of any immediate pecuniary benefit would have been expected to be (and was in fact) limited because, as explained by both Plaintiff's owner and Mr. Bouman, there are difficulties transferring credit hours from a school operated by one company to a school operated by another company due to differences in teaching methods and curriculums. Tr. 38-39,

41

221-23. Third, based on the economic status of Wards Corner's student body, "few" students would have been expected to have the resources to travel to another regional city for education, rendering it "unlikely" that many of Wards Corner's students would transfer/travel to EEG's Virginia Beach school.[17] To use Plaintiff's own word characterizing the regional market, in light of the fact that EEG did not offer a barbering course, and transportation concerns severely hindered many cosmetology students from commuting to another local city, the hearing evidence demonstrates that it is "unlikely" that EEG would have expected to secure any material financial benefit from the closure of Wards Corner's school (and as discussed in greater detail below, the perceived benefit that would potentially redound to EEG's president, an owner of less than one percent of EEG's stock, would be even further attenuated).

Accordingly, the Court finds that the trial evidence demonstrates that, in early 2016, there was in fact "'some' competition for clients" between Plaintiff and EEG, Stivers, 71 F.3d at 743, and although each school may have enrolled cosmetology students from the city where the other school was

---

[17] While Plaintiff's owner clarified such earlier-in-time sworn statement during his live testimony, suggesting that some students could use public transportation or "Uber" to commute, for the reasons discussed herein, it is unlikely that most students/prospective students could afford to travel by Uber on a daily basis, and while bus transportation is available in the region, a student's willingness to rely on the bus naturally decreases as the distance and/or number of required bus transfers increase.

42

located,[18] the degree to which socioeconomic and other factors impacted enrollment/recruitment suggests a far lesser degree of "competition" than would exist in a case where two companies were directly "bidding" against each other, or otherwise actively "competing" for the same clients or contracts.[19]

## 2. Financial Interest in EEG

The hearing evidence established that, in early 2016, Mr. Bouman had a small stock ownership interest in EEG, as several years earlier he executed a promissory note to purchase less than 1% of EEG's privately held stock (.67%). At the time of the Wards Corner accreditation decision, Mr. Bouman was aware that the EEG stock he owned was worth less than he agreed to pay for it, which created some motivation for Mr. Bouman, or more correctly stated, a reasonable person in Mr. Bouman's position, to act to improve EEG's financial condition. That said, considering all of the relevant facts, to include Mr. Bouman's salary level, a reasonable company administrator in Mr. Bouman's shoes would appear to be just as likely, if not more likely, to be motivated by a general desire to "succeed" and to have his or her company perform well as the desire to improve the company's

---

[18] As a matter of local geography, it cannot be said that a student with a Norfolk address necessarily lived closer to Plaintiff's school than EEG's school as EEG's school is only a few miles from the Norfolk border.

[19] The Court notes that the record does not establish whether EEG had the capacity at its Virginia Beach school to accept a large number of transfer students in early 2016 and/or whether EEG was having any difficulty attracting students at its Virginia Beach location at such time.

43

financial condition in order to achieve a consequential benefit to his or her personal bottom line as owner of .67% of EEG's company stock.[20]

In addition to his ownership interest, it is undisputed that during past periods of company prosperity, Mr. Bouman had received raises to his salary and a substantial performance bonus and/or Christmas bonus from EEG. That said, the hearing testimony and evidence demonstrated that Mr. Bouman did not have any realistic opportunity to obtain a bonus at the time he participated in Wards Corner's accreditation decision (or in the foreseeable future). As noted above, Mr. Bouman credibly testified that both EEG, and the entire industry, had been in substantial decline for several years due primarily to changes in federal policy regarding student loan debt.[21] Additionally, the record establishes that Mr. Bouman, who was approximately

---

[20] From a subjective standpoint, the Court finds that Mr. Bouman, whose testimony demonstrated that he is both credible and principled, would have taken lawful and ethical steps to improve EEG's financial status regardless of whether he had any ownership interest in EEG because he was clearly dedicated to his company. Although the Court's objective analysis does not consider such fact, it appears that Mr. Bouman's ownership interest had no impact on the way he conducted himself as President of EEG, nor did it have any actual impact on his conduct as a Commissioner, to include his decision to recommend that Plaintiff's accreditation be withdrawn.

[21] Mr. Bouman had not received a performance bonus since 2013, and his last Christmas bonus was: (1) more than a year removed from his participation in the Wards Corner accreditation decision; and (2) was approximately $5,000, a figure that must be considered in the context of both Mr. Bouman's salary and the fact that EEG's Virginia Beach school was just one of approximately ninety EEG locations (rendering it unlikely that any increased enrollment at this school would have a material impact on the profitability of the company as a whole).

44

70, was considering retirement from EEG, or semi-retirement, which undercuts any suggestion that he was motivated by a personal financial interest in improving EEG's long-term financial position.[22] See, e.g., Tr. 245-46.

### 3. Participation in the Withdrawal Decision

The undisputed facts demonstrate that while Mr. Bouman did not formally "vote" to withdraw Wards Corner's accreditation at the meeting of the full Commission, he had two roles in the accreditation review process.  First, and most significantly, Mr. Bouman was one of three members of the "file review team" that reviewed Wards Corner's file in the days leading up to the meeting of the full NACCAS Board of Commissioners.  As noted above, Mr. Bouman's participation in such file review team was merely by happenstance as he was filling in for an absent Commissioner; however, Mr. Bouman did in fact participate in reviewing Wards Corner's file and he personally signed the "action form" recommending that the full Commission vote to withdraw accreditation.  Joint Ex. 17.

Second, in his role as Chairman of the Commission, Mr. Bouman presided over the meeting of the full Commission at which Ward's Corner's accreditation was considered and ultimately withdrawn by unanimous vote of the other eleven Commissioners

---

[22] Mr. Bouman's partial ownership of EEG would have been surrendered (and valued) at the time of his retirement, so he did have some personal financial interest in the short-term value of EEG's company as a whole.

(including the two Commissioners who were on the file review team with Mr. Bouman). Mr. Bouman did not leave the room during such discussion or otherwise recuse himself from his role "moderating" the discussion (although the record does not reflect the length of the discussion and/or whether any "moderating" actually occurred). Although Mr. Bouman, in his role as Chairman, did not personally participate in any debate engaged in by the full Commission and did not formally cast a vote to withdraw Ward's Corner's accreditation, his vote was arguably symbolically cast through his signature on the "action form."[23] Accordingly, in light of the combination of Mr. Bouman's two roles, if he were found to have had a direct and substantial pecuniary interest in the outcome, his involvement would likely be enough to result in the denial of Plaintiff's right to an impartial decisionmaker.

## 4. Analysis

Considering the totality of the above case-specific facts, the Court finds that Plaintiff fails to demonstrate that it was denied an impartial decisionmaker based on Mr. Bouman's indirect financial interest in the outcome of the Wards Corner

---

[23] It does not appear that the members of the Commission actually had the action form before them when they met and voted unanimously to withdraw Wards Corner's accreditation. Tr. 93, 294. That said, Mr. Bouman freely acknowledged during his testimony that the members of the Commission know which individuals are on which file review teams, that they all knew that one Commission member was absent from the February 2016 meeting, and that they likely knew that Mr. Bouman had filled in to help the file review team with the absent member. Id. at 294-97.

46

accreditation review process. The evidence before the Court
demonstrates that although EEG and Wards Corner may have
competed over "some" fraction of students, the scope of such
competitive interest is best described as limited based on the
locations of the schools and the socioeconomic status of the
student body of both Plaintiff's school and EEG's school.
Moreover, assuming that a person in Mr. Bouman's position would
know that the closure of Ward's Corner's school would provide a
limited competitive benefit to EEG,[24] the degree to which such
limited benefit would inure to Mr. Bouman, if at all, is even
further removed, and accurately characterized as speculative.
While Plaintiff successfully demonstrates that Mr. Bouman was a
partial "owner" of EEG who had previously received performance
bonuses, and thus a reasonable person in his position would have
some financial motivation to advance the profitability of EEG's
Virginia Beach school during the spring of 2016, the case-
specific evidence reveals that such interest was both "slight"
and indirect. Notably, closing Wards Corner's school would not
result in a direct monetary payment to Mr. Bouman, and any

---

[24] The hearing testimony established that a cosmetology school does not
need to be accredited in order to operate in Virginia, although
accreditation is required to enroll students receiving federal financial
aid (a critical funding source). Accordingly, while Mr. Bouman, or any
other Commissioner, may have presumed that withdrawal of Wards Corner's
accreditation would lead to its closure, such result was not a definite
consequence. Moreover, there are other schools in the same geographic
area competing for students, thus further mitigating any benefit to EEG if
Wards Corner's school lost its accreditation and/or closed.

47

"trickle down" financial benefits he would receive in the future were, at least on these facts, remote. Mr. Bouman's financial interest in the outcome of Wards Corner's accreditation review is best described as "limited" in light of: (1) the distances between the various schools; (2) the number of "competitors" in the Hampton Roads region; (3) the acknowledged reality that Plaintiff's students generally lacked access to private transportation and were "unlikely" to commute to EEG's Virginia Beach school; and (4) other relevant case-specific facts, to include the size of Mr. Bouman's base salary, his limited ownership interest in EEG, the fact that EEG's Virginia Beach school represents only approximately 1½ percent of EEG's total revenue, Mr. Bouman's plan to retire in the near future, and the fact that Mr. Bouman had not received a performance bonus in several years.[25]

In addition to the above, Mr. Bouman credibly testified that he was unaware of the proximity of the two schools when he participated in the February 2016 Commissioner's meeting, and while it would have been prudent for a "reasonable person" in

---

[25] The Court makes the observation that Mr. Bouman's substantial performance bonus for the 2012-2013 year, if divided evenly across all EEG's schools, amounts to approximately $1,500 per school. Similarly, if calculated on a revenue basis, the bonus attributed to EEG's Virginia Beach school would be around $2,200. While the Court does not rely on either figure in reaching its decision in this case (because such figures are speculative without factual detail as to actual performance of each school) it provides further context to the Court's findings.

his position to perform additional research and consider recusal, even if only out of an abundance of caution to preserve the appearance of impartiality, the evidence fails to demonstrate that the competitive interest at issue in this case rises to the level that required recusal under the common law right to "fair procedure" and/or Defendant's own established ethical rules.[26]

The Court considers as part of the overall calculus the fact that NACCAS's board is required to include a majority of industry practitioners, as well as Mr. Bouman's testimony regarding the value such practitioners' experience brings to the Commission.    The desire to benefit from such specialized knowledge cannot be used as a shield to avoid the obligation to provide member institutions an impartial decisionmaker; however, a company is not denied its common law right to a fair accreditation procedure merely because one of several commissioners might, on occasion, compete with such company for "some" customers.

---

[26] The Court notes that while the analysis herein is phrased primarily in a manner that addresses whether Plaintiff was afforded its common law fair procedure right to an impartial decisionmaker, such analysis applies equally with respect to whether NACCAS followed its own internal procedures.    NACCAS' conflict of interest policy necessarily requires a Commissioner to evaluate the scope of a potential conflict in determining whether to recuse himself or herself from a specific agenda item, and the application of such fact-specific analysis is consistent with, and co-existent with, the common law right to an impartial decisionmaker.

The Court also considers as part of its calculus the fact that Mr. Bouman did not formally vote to withdraw accreditation, although he did "recommend" that accreditation be withdrawn and most, if not all, of the other Commissioners likely knew that he had made such recommendation. Even with such knowledge, however, in light of Mr. Bouman's limited personal interest in the outcome, and the fact that his participation in the file review team was by happenstance, it would strain credulity to suggest that, in the absence of any actual evidence of impropriety, eleven independent Commissioners, operating with a presumption of honesty and integrity, abdicated such role in order to follow a "recommendation" of Mr. Bouman rather than exercising their own independent judgment.

This Court is well aware of controlling precedent regarding the impact of a biased individual on the independence of a judicial panel, and independent of this Court's obligation to follow such precedent, agrees entirely with its reasoning. Williams v. Pennsylvania, 136 S. Ct. 1899, 1909 (2016) ("The Court has little trouble concluding that a due process violation arising from the participation of an interested judge is a defect 'not amenable' to harmless-error review, regardless of whether the judge's vote was dispositive."). However, on these facts, in this context, Mr. Bouman's indirect interest does not rise to the level that would disqualify him, let alone impute

presumed bias to the entire Commission. Additionally, judicial secrecy is not an issue in this case, and the parties have explored Mr. Bouman's participation in the Commission's decision making process. Moreover, Mr. Bouman did not participate in the final debate before the dispositive vote was cast, nor did he actually cast a vote in the dispositive decision.[27] This matter also did not involve constitutional due process rights, nor a judicial proceeding, but instead involves a private panel intentionally composed of multiple industry representatives. While the procedural posture of the accreditation decision cannot allow this Court to look the other way in the face of evidence of actual bias, or a risk of bias so great that it should be presumed, the facts before this Court do not satisfy either standard, as the indirect financial interest at issue, an interest that was not even known to Mr. Bouman at the time of his participation, does not rise to the level that "would offer a possible temptation to the average . . . [Administrative Adjudicator] to . . . lead him [or her] not to hold the balance nice, clear and true." Caperton, 556 U.S. at 878 (citations

_____

[27] To the extent that Mr. Bouman's role is subject to being characterized as more akin to an administrative investigator/prosecutor making a recommendation to the panel of individuals that would cast the dispositive vote, the Supreme Court has recognized the while prosecutorial bias can rise to a level that raises serious constitutional questions, "the strict requirements of neutrality cannot be the same for administrative prosecutors as for judges, whose duty it is to make the final decision and whose impartiality serves as the ultimate guarantee of a fair and meaningful proceeding in our constitutional regime." Marshall v. Jerrico, Inc., 446 U.S. 238, 249-50 (1980).

omitted); cf. In re Virginia Elec. & Power Co., 539 F.2d at 368
(noting that when considering whether "any other interest"
should disqualify a federal judge from presiding over a civil
case, such judge "must necessarily consider the remoteness of
the interest and its extent or degree"). Stated differently,
the presumption of honesty and integrity is not overcome by
Plaintiff in this case based on allegations of bias and/or the
potential for bias.[28]

This Court's finding in favor of Defendant should not be
interpreted as a tacit endorsement of Defendant's 2016 procedure
for implementing its code of ethics. Notwithstanding Mr.
Bouman's testimony indicating that he personally views as
unworkable a recusal system that considers direct local
competitors (at least for any Commissioner who works for a large
multi-state company like EEG), a desire to avoid inconvenience
to the Commission cannot trump an individual member school's
right to a fair proceeding by a fair tribunal. Frankly, the
instant case presented a relatively close call, ultimately

---

[28] For the reasons argued by Defendant, ECF No. 151, at 13-16, the Court
rejects Plaintiff's late-raised contention that it was denied the right to
fair procedure based on Defendant's method of combining investigative
and/or prosecutorial functions with adjudicative functions. Such claim is
untimely as it was not identified by Plaintiff as a triable issue in the
final pre-trial order. ECF No. 131. Moreover, such claim is without
merit as the fact that the NACCAS Board of Commissioners divided into
small groups to evaluate individual agenda items in greater detail prior
to a debate by the full Commission suggests a reasoned and fair process,
not a process that creates a "risk of unfairness [that] is intolerably
high." Withrow, 421 U.S. at 58; see 7 West's Fed. Admin. Prac. § 8305
(2017 Update).

requiring this Court, and the parties, to wade into a matter best resolved through the administrative process. While the evidence presented in open court demonstrates that Plaintiff's fair procedure rights were not violated, this Court notes its surprise that, in applying the code of conduct, individual NACCAS Commissioners do not always consider whether a school they own or operate is in close proximity to the school being evaluated and/or the degree to which an unfavorable ruling as to a "competitor" school might redound to the financial benefit of the interested Commissioner. See Am. Cyanamid Co. v. F.T.C., 363 F.2d 757, 767 (6th Cir. 1966) ("It is fundamental that both unfairness and the appearance of unfairness should be avoided. Wherever there may be reasonable suspicion of unfairness, it is best to disqualify."). The time, scope, effort and cost of this litigation itself may go a long way in causing NACCAS to re-evaluate its internal rules, and while the Court recognizes that a "state-wide" or arbitrary "25 mile radius" disqualification rule regarding competitor institutions may be akin to using a cannon to shoot a fly, to suggest that no consideration of local competition is a wise policy suffers its own logical fallacies. Balancing such factors, however, is a matter for NACCAS.[29]

---

[29] To the extent Plaintiff contends that NACCAS's ethical policies, as written, fail to comply with federal regulations, such assertion is rejected. The issue requiring the resolution of disputed facts and inferences in this case has always been centered on whether Mr. Bouman's interest in EEG required him to recuse himself under the portions of

### III. Summary and Holding

For the reasons set forth in detail above, having carefully examined the remoteness of Mr. Bouman's interest and the extent/degree of such interest, judgment is to be entered in favor of Defendant.[30]

The Clerk is **REQUESTED** to send a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**

/s/ _____

_____

Mark S. Davis
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
February 12, 2018

---

NACCAS's ethical rules that are not subject to being defined with precision, such as the requirement that a Commissioner consider whether his or her "duty of loyalty to NACCAS . . . can be prejudiced by actual or potential personal benefit from another source." Joint Ex. 3.

[30] The Court notes that there are two outstanding motions for attorney's fees in this case. ECF Nos. 107, 109. They will be addressed by separate Order.